337 So.2d 1300 (1976)
Hattie P. Cooper FOX and Charles J. Fox
v.
TITLE GUARANTY AND ABSTRACT COMPANY OF MOBILE, INC., a corporation.
Hattie P. Cooper FOX and Charles J. Fox
v.
FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION, a corporation.
SC 1617, SC 1579.
Supreme Court of Alabama.
October 1, 1976.
*1301 William Roberts Wilson, Jr., Mobile, for appellants.
Michael J. Salmon, Mobile, for appellee.
ALMON, Justice.
This is an appeal from summary judgments against the defendants-appellants in a suit for ejectment and rent.
On or about November 15, 1972, Hattie P. Cooper Fox and her husband, Charlie J. Fox, approached First Federal Savings and Loan Association of Mobile (now Southern Federal) relative to refinancing their home, which Hattie Fox had acquired prior to their marriage. They dealt with John Watson, a loan officer at First Federal. According to sworn affidavits of the Foxes, Mrs. Fox advised Watson that there was a possibility that the Internal Revenue Service had placed a lien on the house as a result of a transfer made to her by her previous deceased husband. She said she told Mr. Watson that if she owed the Internal Revenue Service, she wanted to use the money from the loan to pay them. Otherwise, she *1302 would use the money to consolidate some bills.
According to the affidavit of Mrs. Fox, Watson advised her and her husband that First Federal had a company that they worked with all the time and, if there was any lien whatsoever, they would find it. The Foxes alleged that they understood Watson to be talking about a title insurance company, and they accepted his representations and placed their trust in him. Thereafter, according to the Foxes, Watson assured them that the title company had cleared the property and there was no lien on it.
According to Watson's affidavit, neither he nor anyone at First Federal made any inducements or representations to the Foxes concerning title to the property. He further stated that at no time was he advised of a lien and neither he nor First Federal undertook any duties to the Foxes concerning title to the property.
On or about December 19, 1972, the loan was closed and a new mortgage was executed to First Federal. The Foxes used the money to pay off debts, thereby dissipating their collateral and ability to pay off the Internal Revenue Service lien which thereafter surfaced in the form of a tax sale.
In December, 1972, First Federal took out a policy of mortgage title insurance from Title Guaranty and Abstract Company of Mobile, Inc. First Federal was the only named insured. On September 25, 1973, the Internal Revenue Service sold the Fox property. Title Guaranty and Abstract Company of Mobile purchased the property at the sale, paying $8,006.89 for it.
Title Guaranty sued the Foxes for ejectment and rent, alleging that Title Guaranty had legal title to the property, that the Foxes were in possession, and that the Foxes were unlawfully withholding possession from Title Guaranty.
The Foxes made a general denial and pleaded unjust enrichment and estoppel as special defenses. They joined to their answer a counterclaim and third party complaint against First Federal. The counterclaim and third party complaint were both in one pleading. It asserted six claims jointly against Title Guaranty and First Federal and sought substantial damages, compensatory and punitive, against them jointly and severally. The claims are summarized briefly below:
1. That First Federal, an agent for Title Guaranty, and Title Guaranty, induced the Foxes to sign a note and mortgage and to borrow $28,840.00 from First Federal by misrepresenting to them that they did not have a tax lien on their property, when in fact there was such a lien; further, that the Foxes had a policy of title insurance on the property with Title Guaranty which they bought and paid for. As a result, they claimed Internal Revenue Service sold their property for taxes, and Title Guaranty bought it at a sale. In addition, the Foxes claimed that Title Guaranty was negligent in searching the title, thereby breaching a legal duty owed the Foxes.
2. On the same allegations, that Title Guaranty and its agent, First Federal, were grossly negligent in failing to discover the tax lien.
3. On the same allegations, that First Federal and Title Guaranty, acting in concert, breached express and implied warranties to them in undertaking to search the title to their property.
4. On the same allegations, the Foxes claimed that they were third-party beneficiaries under a policy of title insurance issued by Title Guaranty to First Federal on their property (a mortgage title policy), and claimed thereunder.
5. On the same allegations, the Foxes claimed that the Title Company and First *1303 Federal were guilty of the unauthorized practice of law.
6. That the same allegations constituted the tort of insult and outrage.
Title Guaranty and First Federal each filed motions to strike and dismiss the counterclaims and Third-Party action; Title Guaranty also filed a motion to strike the Foxes special defenses of estoppel and unjust enrichment.
The trial court ruled on these motions at pre-trial and made the rulings part of its pre-trial order. The order struck First Federal as a third party defendant, ordered the Foxes to amend so as to sever the claims against the two parties, and ordered the severed claim against First Federal docketed and tried as a separate action, the court declining consolidation.
The court also struck the Foxes third defense to the ejectment complaint, estoppel, and their fifth counter-claim or cause of action charging the unauthorized practice of law.
The Foxes never amended.
With trial date approaching, Title Guaranty filed a motion for summary judgment with affidavits; counter-affidavits and the deposition of Mrs. Fox were before the court. The court granted summary judgment for Title Guaranty on its ejectment complaint, and also granted summary judgment for Title Guaranty for the Foxes' counter-claims.
First Federal filed a motion for summary judgment in the severed action against it based on the pleadings, the affidavits, documents and deposition which had previously been filed, and a supplemental affidavit by John Watson, a loan officer of First Federal. The trial court granted First Federal's motion for summary judgment.
The Foxes claim the trial court erred in striking the various defenses, counterclaims and in granting the summary judgments. We shall address ourselves primarily to the summary judgments.
Summary judgment may be granted only where the moving papers show that there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Isbell v. City of Huntsville, 295 Ala. 380, 330 So.2d 607, 10 ABR 769, 775 (1976); Birmingham Television Corp. v. Water Works, 292 Ala. 147, 152, 290 So.2d 636, 640 (1974).
The moving party for summary judgment has the burden of showing the absence of any genuine issue as to all material facts, which, under the applicable principles of substantive law, entitled it to a judgment as a matter of law. On review all reasonable doubts touching the existence of a genuine issue of a material fact must be resolved against the party moving for summary judgment. Bennett v. United Auto Parts, Inc., 294 Ala. 300, 315 So.2d 579 (1975). A trial judge may not make material factual findings on a motion for summary judgment. Ray v. Midfield Park, 293 Ala. 609, 308 So.2d 686 (1975).
Basically, what the Foxes are attempting to say is that they have some rights under the title insurance policy issued to First Federal. This claim is predicated upon their allegations with supporting affidavits that they paid the premium for the insurance policy and that Watson was also the agent of Title Guaranty and represented to them that no tax lien was outstanding; that because of these representations made to them, Title Guaranty had some obligation to them resulting from Title Guaranty's negligent failure to discover the tax lien. The effect of what the Foxes claim is that Title Guaranty under the circumstances had a duty to pay them the amount of the tax assessment which would have permitted them to pay off the tax lien and keep their house. They assert that Title Guaranty should be estopped from maintaining an ejectment suit. They contend that Title Guaranty has profited from its own negligence. The Foxes are continuing to pay the mortgage payments to First Federal.
In Mrs. Foxes' affidavit in opposition to summary judgments she stated:

*1304 "I clearly understood that Mr. Watson regularly dealt with the title company and in fact that I was hiring the title company through him to check the title and specifically check and determine whether there was any lien from the Internal Revenue Service. I was led to believe that the title company, plaintiff in this lawsuit, was engaged in the business of making abstracts of titled real estate for hire and I did, in fact, hire them and paid them, to make the search upon which I relied when floating the above mentioned loan.
"I have lost my house, my home, and I lost it because I relied on the representations of the title insurance company, through Mr. Watson, that my title was clear. There is no other reason that I lost this house."
In her deposition, Mrs. Fox further stated:
"Q. All right. And, what happened after your initial conversation with Mr. Watson?
"A. Well, like I told him, I had no proof. I had received no notice or lien about Internal Revenue having a lien. I said that it was only told to me in person that there was a lien, but there was no proof. So, in the meantime, he said I will let you know about the money, because we deal with insurance companies all the time.
"Q. At the hospital?
"A. No, at the first Federal, talking to Ron Watson. He said if there was a lien, they would find it. We deal with them all the time. I said, okay, but he said, there will be a fee and you will have to pay for it. And, I told him all right.
"Q. All right. So, you told him you had heard there was a lien and you thought there was a lien?
"A. Yes.
"Q. And he said he would find out about it?
"A. He said they would find it. He placed emphasis that they would find it."
If the summary judgment is upheld, the result would be that Title Guaranty would have (1) the premium for the policy paid by the Foxes, (2) the Foxes home, worth at least $28,480.00, for which Title Guaranty had only paid approximately $8,000.00; and (3) Title Guaranty would have no obligation under the insurance policy so long as the Foxes continued to make mortgage payments for which they are personally liable. The Foxes argue that to allow Title Guaranty to prevail is unjust enrichment and would permit a party to profit from its own wrong.
Although not exactly in point, the case Shine v. Nash Abstract & Investment Co., 217 Ala. 498, 117 So. 47 (1928) is persuasive on the questions of abstractors' liability and third party beneficiaries.
At this stage of the proceeding, we have not addressed ourselves to each defense, counter-claim, etc. We are clear to the conclusion, however, that the summary judgments were prematurely granted. They are reversed and the cause is remanded.
REVERSED AND REMANDED.
HEFLIN, C. J., and BLOODWORTH, MADDOX, FAULKNER, EMBRY and BEATTY, JJ., concur.
JONES, J., concurs specially.
JONES, Justice (concurring specially):
My first inclination was to dissent and take issue with the majority opinion's reversal of the trial Court's order granting summary judgment. After much consideration, I concur in the result because I believe there is a possibility that the motion for summary judgment was prematurely granted.
Whether the plaintiff's testimony generates the barest scintilla of a genuine issue of fact is extremely borderline. It is true that she says by way of conclusion that she relied on First Federal's representation to the effect, "if there is an IRS lien on your property, we will find it." If we had this *1305 case in its present posture of the evidence and the trial Court had granted a directed verdict, I would affirm.
Here is the difficulty, as I see it, with the plaintiff's case. When she went to First Federal for an additional loan, she either owed IRS a delinquent tax assessment or not. IRS either had an outstanding lien on the subject property or not. That she owed the tax, that the assessment was delinquent and final, and that the lien was filed of record seems to be uncontested. The fact that the title company issued the mortgage insurance and either overlooked the lien of record or failed to except this incumbrance in its contract of title insurance, alters in no respect the plaintiff's debt to IRS or the right of IRS to collect the debt through enforcement of the lien through a tax sale.
Perhaps there is a conceivable circumstance by which the defendant's misrepresentation induced the plaintiff into a sense of false security and thereby caused her not to take the steps which she might otherwise have taken with respect to the tax sale. I must say quite frankly that my personal experience in representing tax payers in delinquency assessment cases has not enabled me to conceive of any such circumstance. But, because I may be missing something, I would not foreclose plaintiff's right to proceed to trial.
Even assuming that the plaintiff's reliance upon the defendants' representation that they would find the lien, which they did not, in someway worked to the plaintiff's detriment in delaying or otherwise hindering her ability to cope with IRS's enforcement of that lien, the only possible damage which I can foresee is that she was denied the right to pay off the debt and retain her property. This was done for her by the title company at the tax sale, and it may well be that equity will afford her the relief of restoring her title to the property upon her reimbursement to the title company of its outlay at the tax sale. Indeed, this would seem to be an equitable result in order to avoid unjust enrichment by the title company.
In summary, then, it is difficult for me to perceive, under the facts as I understand them, how plaintiff has changed her position as the result of anything that she says the defendants did or said. It must be remembered that this case is totally different from the ordinary purchaser-title insurance company relationship. Ordinarily, the purchaser contracts for a policy of insurance to guarantee title to property to which he is a stranger. If there are incumbrances which are overlooked and not excepted by the title insurance company, the purchaser's loss flows directly from this breach of obligation. Here, the plaintiff, in applying for her loan, informed First Federal only vaguely concerning facts and circumstances of a tax assessment against her that she had been living and dealing with over a long period of time.
I would hold that summary judgment was prematurely granted, but I also would observe that plaintiff's evidence of reliance upon the representation to her detriment would have to be expanded and clarified to withstand a directed verdict.